**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 13-cv-2566-CMA-MJW

TRAVIS J. SIMMONS,

     Plaintiff,

v.

BRYCE HINTON, individually,
SCOTT BIRD, individually, and
LAKE COUNTY SHERIFF RODNEY FENSKE,
individually and in his official capacity,

     Defendants.

---

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

This matter is before the Court on Defendants' Motion for Summary Judgment

(Doc. # 46.)  Because there are disputed facts pertaining to critical issues in this case,

the Court denies Defendants' Motion with respect to Plaintiff's claims of excessive force,

battery and assault, and extreme and outrageous conduct.  However, because Plaintiff's

claims against Sheriff Fenske fail as a matter of law, the Court grants summary

judgment on those claims.

## I.   <u>BACKGROUND</u>

At approximately 2:50 AM on the morning of August 23, 2012, Lake County

Sheriff Deputy Bryce Hinton observed a Dodge pickup truck, driven by Plaintiff Travis

Simmons, pass by the intersection of McWethy and 10th Street in Leadville, Colorado.

Deputy Hinton noticed that the truck's license plate lamps were not illuminated,[1] and

attempted to initiate a roadside stop by pulling behind the truck and activating his lights

and siren.  (Doc. ## 46-2; 46-3 at 33:11-34:6; 37:3-8.)  Plaintiff did not immediately pull

over and stop; instead, he continued driving for approximately half a mile, until he

arrived at his residence, at 1004 Mt. Massive Drive.  (Doc. # 46-3 at 37:11-16.)  During

this drive, Deputy Hinton noticed that the Dodge "weaved."  (Doc. # 46-2.)  Plaintiff

pulled into the driveway, and rather than remaining in his vehicle and providing his

license and registration to Deputy Hinton, Plaintiff exited the vehicle.  (*Id.*; *see also* Doc.

## 46-3 at 37:19-25; 46-1 at 78:9-11, 94:7-11).

Thereafter, Deputy Hinton's and Plaintiff's respective versions of events diverge

significantly.  Deputy Hinton contends that he exited his vehicle, took out his Taser X26,

and ordered Plaintiff:  "Do not move now!  Get down!  Stay down!" (Doc. ## 46-2; 43-3

at 38:1-3; 46-5 at 1.)  Deputy Hinton claims that Plaintiff did not listen to these

commands and continued walking quickly toward the front door, and as Deputy Hinton

ran toward Plaintiff and the two were one to five yards apart, Plaintiff motioned as if he

was going to push away Deputy Hinton, and then opened the front door to the home.

(Doc. ## 46-2; 46-3 at 96:2-17; 46-5 at 1.)

Plaintiff disagrees:  although he admits he did not remove his license and

registration from the vehicle, he claims he initially intended to speak with Deputy Hinton

---

[1] Plaintiff denies that his license plate light was not illuminated.  This dispute, however, is not a "material" for purposes of this Motion.

when he exited his vehicle, and that he did not proceed toward the front door until he witnessed Deputy Hinton "aggressively" approaching him with what he thought was a drawn gun.  He also contends that he did not hear Deputy Hinton's orders to stop,[2] and denies that he made any sort of shoving motion towards Defendant Hinton prior to opening his door.  (Doc. # 51 at 2-3, citing Doc. # 51-2 at 78:13-81:15.)

After Plaintiff opened the unlocked door to the house, Deputy Hinton followed him inside and fired his taser; taser probes made contact at Plaintiff's left buttock and right leg.  Plaintiff fell to the ground, and Deputy Hinton repeatedly ordered Plaintiff to roll on his stomach and place his hands behind his back, but Plaintiff repeatedly refused to comply.  (*See* Doc. ## 46-2; 46-3 at 63:2-4; 46-1 at 82:17-20.)  Deputy Scott Bird and a Leadville Police officer then arrived at the scene as backup.  (Doc. ## 46-2; 46-3 at 65:22-66:2; 46-4 at 12-18.)  Both Deputies Bird and Hinton contend that, as they tried to handcuff Plaintiff, he continued resisting and refused orders to put his hands behind his back.[3]  Specifically, he attempted to pull away from them, get to his feet, kick them, and gain control over Deputy Bird's holstered gun.  (Doc. ## 46-3 at 68:12-25; 46-4 at 21:5-12, 26:5-27:11; 46-7.)  Deputy Hinton applied a wrist lock during the struggle to subdue Plaintiff, and Deputy Bird also applied a wrist lock and delivered knee strikes to Plaintiff's outside thigh.  (Doc. #46-3 at 65:12-19, 91:24-92:2.)  Additionally, after Deputy

---

[2] Defendants submitted a transcript of a call Deputy Hinton made to Dispatch at the time of this incident, in which Deputy Hinton told Dispatch that "I'm trying to stop a vehicle right now," and then shouted, "Do not move now!  Get down!  Stay down!"  (Doc. # 46-5.)  Plaintiff does not deny that Deputy Hinton gave orders – only that he did not **hear** those orders.

[3] Deputy Hinton is five foot nine and half inches tall, Deputy Bird is five foot and nine inches, and Plaintiff is six foot and one inch.  (Doc. ## 46-1 at 140:18-19; 46-3 at 61:1-2, 46-6 at 32:24-25).

Bird felt a tug on his holster, he delivered a single closed-fist punch to Plaintiff's face, believing that Plaintiff was attempting to disarm him.  (Doc. # 46-7; 46-6 at 30:13-31:15.)

In total, Deputy Hinton activated his taser four times.  The first three activations were in "probe" mode, in which the taser fires two probes and delivers an electrical charge which results in five seconds of neuromuscular incapacitation (NMI), immobilizing the  target.  (Doc. ## 46-1 at 12:5-13:6; 46-3 at 73:14-24, 74:15-19; 46-2; 46-7.)  According to Deputy Hinton, the first activation occurred upon Plaintiff's entering the front door to the home.  (Doc. # 46-2.) The second occurred after Plaintiff was "still attempting to get off the ground," as Deputies Hinton and Bird were attempting to handcuff him.  (*Id.*)  The third activation, after Plaintiff continued to resist and fight the officers, failed to have any effect on Plaintiff.  (*Id.*)  The fourth activation was in "drive-stun" mode, in which the taser is pressed against an individual's body and delivers an electrical arc between two electrodes on the front of the device.  (Doc. # 46-1 at 13:6-8.) "Drive-stun" mode results in pain, but not NMI.  (*Id.*)  According to Deputy Hinton, the fourth activation occurred after Deputies Hinton and Bird attempted to handcuff him using their respective wrist locks (and after Deputy Bird's punch to Plaintiff's face), because Plaintiff continued to be combative and refused to place his hands behind his back.  (Doc. # 46-2.)  After the fourth taser deployment, Plaintiff stopped resisting, and the officers were able to handcuff him.  (*Id.*)  After Plaintiff was handcuffed, Deputy Hinton and Deputy Bird rolled him into a sitting position, placed their arms under his armpit, braced his elbows, and picked him up from the ground.  (Doc. # 46-6 at 34:2-

15.)  Once on his feet, according to Bird and Hinton, Plaintiff continued to resist and be

actively aggressive.  (Doc. ## 46-3 at 74:14-20;46-6 at 35:13-36:1.)

Plaintiff claims that he was not refusing to comply with Deputy Hinton's orders;

rather, that he was immobile and could not hear those orders or otherwise respond to

them due to the effects of the taser.  (Doc. ## 51-2 at 85:1-87:9, 96:19-97:18.)[4]  More

importantly, he denies ever resisting the Deputies in any form, including ever attempting

to kick the deputies or to disarm Deputy Bird, because he claims that the taser rendered

him immobile.  Specifically, at his deposition, Plaintiff testified that after being tased, "I

couldn't move.  I was just – I couldn't move. . . I remember just being helpless, not being

able to move, not being able to put my arms back, not being able to do anything; just

basically take a beating is what it felt like."  (Doc. # 51-2 at 85:1-86:1.)  He also denied

moving at all when he was on the floor: "I don't think I could move.  I just remember not

being able to move.  I remember being immobile, possibly trying to get into like a fetal

position and just – just to get it to stop.  I don't know.  There was – basically it was just

---

[4] At his deposition, Plaintiff also testified as follows:

> Q:  Ok.  Could you hear anything?
> A:  I don't remember hearing anything.  It was – all you can think about is being – is the electricity.   I mean, it doesn't seem like anything else is gonna – that takes over everything, pretty much.
> Q:  So you didn't hear anybody commanding you to put your hands behind your back?"
> A:  No.
> . . . .
> [A]t the time, I wasn't – I just remember not being able to move and getting the knees in my back and then someone trying to pull my arms, but I remember I was just stiff.  So one person is laying – Is on my back shocking me, and the other one, while my arms are still, is trying to pull my arms back.  So I really couldn't do anything, but – I mean, I was helpless.  I couldn't – I couldn't do what they were trying to get me to do.  I was just basically immobile.

(Doc. # 51-2 at 85:1-9, 86:16-25.)

pain.  I don't remember anything but that."  (*Id.* at 86:19-97:18.)  Plaintiff also contends

that the Deputies ripped him up from the ground by his handcuffs, and that once he was

standing, he did not resist – and indeed, could not resist – on account of feeling "woozy"

after being tased.  (*Id.* at 99:5-101:19.)

En route to jail, Plaintiff was taken to the emergency room at St. Vincent General

Hospital, where his blood was drawn and he was medically cleared.  (Doc. # 46-2.)  Dr.

Justin Smiley, who saw Plaintiff at St. Vincent, wrote in his emergency room record that

"1 taser L buttock removed" and "1 taser posterior thigh removed."  He also noted that

Plaintiff had a "superficial 1 cm laceration below L eye," and that Plainitff had a

"contusion of bilateral wrists with overlying 2cm abrasion on left wrist," and a "chest

contusion."  (Doc. # 46-12.)  Additionally, the Colorado Department of Public Health and

Environment tested Plaintiff's blood sample, resulting in a BAC of .221; a sample tested

by a private lab revealed a BAC of .220.  (Doc. ## 46-13, 46-14.)

## II.  LEGAL STANDARD

Summary judgment is appropriate if the moving party demonstrates there is "no

genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  In applying this standard, the Court views the evidence and

all reasonable inferences therefrom in the light most favorable to the nonmoving party.

*Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).  On summary

judgment, a district court may not weigh the credibility of the witnesses.  *Fogarty v.*

*Gallegos*, 523 F.3d 1147, 1165-66 (10th Cir. 2008).  "Practically speaking, this means

that the court may not grant summary judgment based on its own perception that one

witness is more credible than another; these determinations must be left for the jury."

*Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## III.  ANALYSIS

### A.  Excessive Force: Qualified Immunity

Under the doctrine of qualified immunity, government officials are protected from liability for civil damages if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal quotation marks omitted)).  Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 121 (2001).  Because of the underlying purposes of qualified immunity, courts address qualified immunity questions differently from other summary judgment decisions. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).  In determining whether an officer is entitled to qualified immunity, the Court generally applies the two-step test from *Saucier*, 533 U.S. at 201.  *See Pearson*, 555 U.S. at 236 (holding that judges of district courts may exercise their sound discretion in deciding which of the two prongs of *Saucier*'s qualified immunity analysis should be addressed first given the particular circumstances at hand, and that "the *Saucier* protocol should not be regarded as mandatory in all cases . . . [but] . . . it is often beneficial.")

First, the Court must answer a threshold question:  "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's

conduct violated a constitutional right?"  *Saucier*, 533 U.S. at 201.   Second, the court

asks whether the right was clearly established at the time of the alleged violation, i.e.,

whether it would have been clear to a reasonable officer that his conduct was unlawful

under the circumstances presented.  *Id.* at 201-02.   If the plaintiff fails to satisfy either

part of the two-part inquiry, the court must grant the defendant qualified immunity.

*Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995).  If the plaintiff successfully

establishes the violation of a clearly established right, the burden shifts to the

defendant, who must prove "'that there are no genuine issues of material fact and that

he or she is entitled to judgment as a matter of law.'"  *Id.* (quoting *Hinton v. City of*

*Elwood*, 997 F.2d 774, 779 (10th Cir. 1993)).

To establish a constitutional violation at the first step, a plaintiff must demonstrate

the force used by an officer was objectively unreasonable.  *Cavanaugh v. Woods Cross*

*City*, 625 F.3d 661, 664 (10th Cir. 2010).  There is no clear-cut, "easy-to-apply" legal

test for whether an officer's use of force is excessive; instead, courts must "slosh [their]

way through the fact-bound morass of 'reasonableness.'"  *Cordova v. Aragon*, 569 F.3d

1183, 1188 (10th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 383 (2007)).  This

requires the Court to weigh "the nature and quality of the intrusion on the individual's

Fourth Amendment interests against the importance of the governmental interests

alleged to justify the intrusion."  *Id.*  In determining whether the use of force was

reasonable, then, the Court must pay careful attention to the totality of facts and

circumstances in the particular case, including (1) the severity of the crime at issue, (2)

whether the suspect posed an immediate threat to the safety of the officers or others,

and (3) whether he actively resisted arrest or attempted to flee.  *Graham,* 490 U.S. at 396.  Additionally, as a general matter, the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*  This is because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Saucier*, 533 U.S. at 205 (citing *Graham*, 490 U.S. at 397).

In this case, there are numerous facts in dispute.  Viewing the disputed evidence in the light most favorable to Plaintiff, as the Court must, Plaintiff was tased despite the fact he did not have a weapon or make any threatening gestures toward Deputy Hinton, and then was tased again repeatedly – as well as punched in the face and kneed[5] – while he was laying on the ground immobile (and/or in a fetal position).

Based on these facts, the Court finds that the *Graham* factors weigh heavily in Plaintiff's favor.  When Deputy Hinton applied force, Plaintiff's crimes included a minor traffic infraction (i.e., driving without a license plate light), as well as the failure to yield to an emergency vehicle and refusing to comply with law enforcement commands.[6]

---

[5] Although Deputy Hinton was the one who deployed the taser, Deputy Bird actively participated in attempting to subdue Plaintiff by punching him in the face and delivering the knee strikes.  Accordingly, the attempt to subdue Plaintiff was a "group effort," and a reasonable jury could find both Deputy Bird and Deputy Hinton both liable for excessive force.  *See Estate of Booker v. Gomez*, 745 F.3d 405, 422 (10th Cir. 2014) (quoting *Bletz v. Gribble*, 641 F.3d 743, 754 (6th Cir. 2011) ("[A] police officer may be responsible for another officer's use of excessive force if the officer . . . actively participated in the use of excessive force.")

[6] Although Plaintiff was also suspected of driving under the influence, certainly a serious and dangerous crime, by the time Deputy Hinton was applying force, Plaintiff was no longer driving and his truck was safely parked in his driveway.   As such, he no longer represented a danger to himself or others.

Defendants argue that the Court should also consider that Plaintiff was "resisting arrest, assault, battery, and attempting to disarm an officer"; however, as described above, there are disputed issues of fact as to whether Plaintiff was resisting arrest, assaulting or battering the Deputies, or attempting to disarm Deputy Bird.

Nevertheless, the second factor – whether the suspect posed an immediate threat to the safety of the officer or others – certainly weighs in Plaintiff's favor. Defendant notes that "Plaintiff's exit from his vehicle and flight towards the 1004 Mt. Massive house was a threat to the safety of the unknown occupants within, and it was a threat to the officers at the scene who did not know whether plaintiff was armed or whether he had access to weapons inside his house." (Doc. # 46 at 14.)  While this might have meant that Plaintiff posed a threat **when he was at the doorway**, by the time he was tased and –according to his own account – laying motionless on the floor, he would not pose an immediate threat.  Additionally, in *Cavanaugh*, 625 F.3d at 665, another taser case, the Tenth Circuit held that a reasonable jury could conclude a suspect did not pose an immediate threat under very similar circumstances.   In that case, police officers responded to non-emergency call placed by a husband after his wife stormed out of the house with a kitchen knife in her hand.  *Id.* at 662-63.  Officers came to the couple's home and spotted the wife, followed her at a distance of six feet, and after she quickly moved toward her front door – without a knife in her hand – one officer tased her.  *Id.*  The Court noted that the officer who tased her could see that she did not have a visible weapon, and that she did not act aggressively toward the officer or otherwise threaten him.  *Id.*  To put it differently, the **mere possibility** that she might

have a weapon, **despite earlier reports that she had a knife,** was not enough to constitute an immediate threat.   As for the instant case, again viewing the facts in the light most favorable to Plaintiff and taking seriously the admonition that the Court must judge the amount of force used "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008), while it might have been reasonable for Deputy Hinton to tase Plaintiff **initially**, a reasonable officer would not have reason to believe that a person who had already been tased once and was lying motionless on the ground posed an **immediate** threat to the officer's safety.

Additionally, when the evidence is viewed in the light most favorable to Plaintiff, the third factor, i.e., whether Plaintiff was actively resisting arrest or attempting to flee, weighs very strongly in favor of Plaintiff.  Plaintiff contends that he was immobile and did not resist in any fashion, and a reasonable jury – if they ultimately give credit to his story – could fairly conclude that he was not resisting arrest.  Defendants, however, argue that the facts surrounding Plaintiff's resistance to arrest and failure to follow orders are not "genuinely" disputed.  *See Scott*, 550 U.S. at 380 (noting a court may not adopt a version of the facts on summary judgment which is "blatantly contradicted by the record, so that no reasonable jury could believe it.")  Specifically, they contend that Plaintiff's account that he was "'rendered immobile' during all commands is refuted by the fact that Tasers cause immobility only in probe mode and only for up to five seconds at a time. Plaintiff agrees with how Tasers operate. . . . Also, [the taser] activations were not constant; but with breaks of 8 seconds, 2 minutes and 49 seconds, and 22 seconds. . .

Result: undisputed fact." (Doc. # 55 at 4.)   While clever, this argument is too clever by half.  Far from a "blatant contradiction" in the record, the fact that a taser renders a suspect immobile for five seconds only and that there were breaks in the taser's deployment here supports the notion that Plaintiff **could have resisted** at certain points during the encounter – not that he did, in fact, do so.  Indeed, a reasonable juror could credit Plaintiff's version of events about the effect that the taser had on his body and his ability to resist, and the fact that he was not, in fact, resisting or attempting to disarm Deputy Bird.[7]   Unlike in *Scott*, where the plaintiff's account was discredited by a videotape that completely contradicted his version of events, 550 U.S. at 380, the technical workings of a taser do not resolve whether Plaintiff was actually resisting here.  Such a determination inevitably requires that Plaintiff's credibility be weighed against the credibility of Deputy Hinton and Bird, and "our judicial system leaves credibility determinations to the jury." *Id.*

---

[7] Additionally, Defendants argue that Plaintiff's assertion that he was not warned to stop when he initially exited his truck and that he made a threatening gesture toward Hinton prior to entering the house is not genuinely disputed, because Plaintiff's "recollection a year and a half after his intoxicated arrest is **refuted by the dispatch recording**, which reflects the events as they happened, and refuted by Hinton's narrative written the same day." (Doc. # 55 at 3) (emphasis added).  Although the dispatch recording indicates in a "real-time" fashion that Deputy Hinton was recorded **warning** Plaintiff to stop, and while it appears that Deputy Hinton's first use of the taser might have been reasonable – given Plaintiff's traffic violation, his failure to yield more quickly, that he seemed to be driving under the influence, and the fact that he ignored Deputy Hinton's warnings and went into his house – whether it was reasonable for Deputy Hinton to continue to tase Plaintiff, and for Deputy Bird to punch him in the face, depends on how Plaintiff acted **after being tased** for the first time.

In sum, pursuant to the *Graham* factors, Plaintiff has presented sufficient evidence to raise triable issues that Deputies Hinton and Bird violated his Fourth Amendment rights.[8]

Having determined that Plaintiff may be able to prove a Fourth Amendment violation, the Court turns to the second qualified immunity prong. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The question of whether a right is clearly established must be addressed in light of the specific context of the case. *See id.* That is, the question is not whether there exists a general right to be free from excessive force, but whether Plaintiff had a clearly established right under the facts of this case. *See Morris*, 672 F.3d at 1196.

"Ordinarily," for a rule to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). However, because excessive force jurisprudence requires a totality-of-the- circumstances inquiry that pays careful

---

[8] Pointing to Plaintiff's hospital report, Defendants also argue that Plaintiff did not sustain actual injuries here, but merely "superficial, minor injuries consisting of scratches and bruises." (Doc. # 46 at 20.) Defendants point to *Fisher v. City of Las Cruces*, 584 F.3d 888, 899 (10th Cir. 2009), in which the Tenth Circuit held that a Plaintiff must show – in a "handcuffing case" – "an actual, non-*de minimis* physical, emotional, or dignitary injury to succeed on a claim." Of course, Plaintiff does not claim he suffered injuries solely from being handcuffed, but also from the taser, and these alleged injuries are more than *de minimis*. Specifically, he asserts that taser deployment has had lasting repercussions, both physically (in terms of low back pain and sleep disruption that he claims resulted from being tased) and mentally/emotionally (in terms of PTSD that he claims resulted from the incident). (Doc. ## 51-2 at 13:7-17, 51-13 at 3; 51-14.)

attention to the facts of a particular case, "there will almost never be a previously published opinion involving exactly the same circumstances." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (citing *Graham*, 490 U.S. at 396). Accordingly, the Tenth Circuit has adopted a "sliding scale" to determine when law is clearly established. "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)). Thus, when an officer's violation of the Fourth Amendment is "particularly clear from *Graham* itself," a Plaintiff does not need a second decision with greater specificity to show that a legal rule was "clearly established." *Id.*

Viewing the disputed evidence in the light most favorable to Plaintiff, Plaintiff did not hear Deputy Hinton's warnings, and he continued to be tased (and was punched in the face and kneed in the leg) despite being unable to move or resist.   The Court finds a reasonable law enforcement officer would have known that these actions, in the face of nonresistance, constituted excessive force. *See Buck v. City of Albuquerque*, 549 F.3d 1269, 1291 (10th Cir. 2008) (holding that it was "clearly established" that police officers could use only minimal force to effectuate the arrest of a person suspected of a minor offense, who posed no threat to the safety of the officers, and who made no attempts to flee or resist arrest).  In *Cavanaugh*, 625 F.3d at 667, decided in 2010*,* the Tenth Circuit held that the use of a taser on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning was a violation of the Fourth Amendment, and that this was "clearly established" law for

purposes of the second qualified immunity prong.  *See also Casey*, 509 F.3d at 1285

(holding that a case presented "clearly established" law as to a Fourth Amendment

violation when "a citizen peacefully attempting to return to the courthouse with a file he

should not have removed has had his shirt torn, and then been tackled, tasered,

knocked to the ground by a bevy of police officers, beaten, and tasered again, all

without warning or explanation.")   At trial, a reasonable jury could find that Deputy

Hinton's **continued use** of his taser after the first deployment, combined with Deputy

Bird's punch to Plaintiff's face, was without legitimate justification in light of *Graham*.

Therefore, neither Deputy Graham nor Deputy Hinton is entitled to qualified immunity.

### B. Excessive Force: Fourth Amendment Claims

Claims of excessive force are analyzed under the objective reasonableness

standard of the Fourth Amendment.  *Graham,* 490 U.S. at 395. This reasonableness

inquiry overlaps with the qualified immunity question, which also requires the application

of a reasonableness standard in order to determine whether an officer violated a clearly

established right. *Cram*, 252 F.3d at 1131.  In its qualified immunity analysis, the Court

has determined that Plaintiff presented sufficient evidence to raise triable issues as to

whether Deputies Hinton and Bird violated his Fourth Amendment rights.  As such,

Plaintiff's Fourth Amendment claims also survive summary judgment.

### C. Plaintiff's Assault Claim Against Deputy Hinton and Battery Claims Against Deputies Hinton and Bird

Defendants argue that Deputies Hinton and Bird are shielded from Plaintiff's

assault and battery claims by application of C.R.S. § 18-1-707(1), which provides that

> [A] peace officer is justified in using **reasonable and appropriate** physical force upon another person when and to the extent that he reasonably believes it necessary:
>
>> (a) To effect an arrest or to prevent the escape from custody of an arrested person unless he knows that the arrest is unauthorized; or
>> (b) To defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force while effecting or attempting to effect such an arrest or while preventing or attempting to prevent such an escape.

As described above, for purposes of this summary judgment Motion, Plaintiff has alleged adequate facts to survive summary judgment on his claim that the Deputies used objectively unreasonable physical support when they arrested him.  Consequently, if a reasonable jury finds that the force used was not reasonable and appropriate, C.R.S. § 18-1-707(1) would not shield Defendants from Plaintiff's assault and battery claims.

### D.  Plaintiff's Extreme and Outrageous Conduct Claims

Defendants contend that Plaintiff's extreme and outrageous conduct claims against Deputy Hinton and Deputy Bird fail as a matter of law because Plaintiff has not alleged conduct that is sufficiently "outrageous."  *See Coors Brewing Co. v. Floyd*, 978 P.2d 663, 665-66 (Colo. 1999) (internal quotation marks omitted) ("Before permitting a plaintiff to present a claim for outrageous conduct to the jury, the trial court must initially rule on the threshold issue of whether the plaintiff's allegations of outrageous conduct are sufficiently outrageous as a matter of law . . . [i.e.,] whether reasonable persons could differ on the question.")  Specifically, Plaintiff must show that the Deputies' conduct here was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community." *Id.* at 666.  To survive summary judgment on this claim, Plaintiff must present evidence "that the defendants engaged in outrageous conduct with the specific intent of causing severe emotional distress or that the defendants acted recklessly with the knowledge that there was a substantial probability that their conduct would cause severe emotional distress." *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 883 (Colo. 1994).

Defendants' argument – that Plaintiff's treatment at the hands of Deputies Hinton and Bird was not actually "outrageous" – is, of course, premised on the view that the Deputies deployed reasonable force because Plaintiff was resisting arrest, including by attempting to disarm Deputy Bird.   The Court, however, concludes that a reasonable juror could conclude, upon finding Plaintiff to be more credible than the Deputies, that it is beyond the bounds of decency for a peace officer to repeatedly use a taser on an unresisting suspect, and punch him in the face while delivering knee strikes, and that doing so also constituted, at the very least, "reckless" behavior on the part of the Deputies.[9]

### E.  Municipal Liability Claim Pursuant to 42 U.S.C. § 1983

A municipality may not be held liable under § 1983 merely on the basis of its status as an employer.  Rather, to establish municipal liability, a plaintiff must demonstrate two elements: (1) a municipal employee committed a constitutional violation; and (2) a direct causal link between the injury alleged and a municipal policy or custom.  *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).  For

---

[9] Moreover, Plaintiff has presented adequate, unrefuted evidence that he has obtained mental health treatment for PTSD, which he claims resulted from this incident.  (Doc. # 51-14.)

purposes of the instant summary judgment motion, the Court has already found that

Plaintiff has provided sufficient evidence to create triable issues on the question of

whether Deputy Hinton and Deputy Bird violated Plaintiff's Fourth Amendment rights.

Thus, the issue is whether Plaintiff can show a direct causal link between policies or

customs of the Lake County Sheriff's Department and the constitutional injury.

Plaintiff's response to Defendants' motion for summary judgment identifies two theories

for municipality liability under § 1983: (1) failure to adequately train, supervise, or test

deputies on the proper use of tasers, and the deployment of tasers for deputies for use

in the field "without departmental knowledge of how to collect and analyze data from the

Tasers to insure their proper function and field use"; and (2) negligent hiring of

Defendant Hinton.

As for Plaintiff's first theory, to establish a claim for failure to train, Plaintiff must

first prove that Lake County's training was, in fact, inadequate.  If Plaintiff can do so, he

must then satisfy the following requirements:

> (1) the officers exceeded constitutional limitations on the use of force; (2)
> the use of force arose under circumstances that constitute a usual and
> recurring situation with which police officers must deal; (3) the inadequate
> training demonstrates a deliberate indifference on the part of the city
> toward persons with whom the police officers come into contact, and (4)
> there is a direct causal link between the constitutional deprivation and the
> inadequate training.

*Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000) (quoting *Allen v. Muskogee*, 119

F.3d 837, 841-42 (10th Cir. 1997)).

Plaintiff points to two specific ways in which this training was inadequate: that

Deputy Hinton used his taser "under the mistaken belief that the number of times a

taser is applied to a subject is irrelevant" and "without the knowledge of how to check if

the Taser was properly working through spark tests or to retrieve the evidence

necessary to know if he had been using it safely."  (Doc. # 51 at 25, citing 51-9 at 24:23-

25:4; 51-6.)  Plaintiff also cites his law enforcement expert, whose report noted that

> The training program, as well as the administrative control of the Lake
> County TASER program, was deficient.  Deputy Hinton had been certified
> to use a TASER just six months prior to this incident involving [Plaintiff]. . .
> **In reviewing the decisions made by Deputy Hinton during his contact
> with [Plaintiff] however, it is relatively obvious that the training was
> insufficient** in terms of for example: when to deploy the TASER; how to
> deploy the TASER; the difference between drive stuns and probe stuns;
> [etc.] . . . Moreover, I have seen no evidence that Deputies Hinton and
> Bird have ever been exposed to stress inoculation training where they
> learn, through live scenario training using actors and actresses, how to
> manage their adrenaline and react under stress. . . .When coupled with
> the inability of the department to periodically download and evaluate past
> and current TASER applications, and to periodically measure
> electronically their TASERS . . . it is evident that the training program and
> administrative control over the TASER program was not in concert with
> LEIS[10] as discussed earlier in this report.

(Doc. # 51-6 at 5.)  Although this evidence might well suggest that Lake County's

training and supervision was deficient, Plaintiff must provide evidence as to more than a

deficiency – he must also provide evidence of deliberate indifference on the part of Lake

County with respect to its training of its deputies.  To show deliberate indifference,

Plaintiff must present facts showing that "the municipality has actual or constructive

notice that its action or failure to act is **substantially certain** to result in a constitutional

violation, and it **consciously or deliberately chooses to disregard the risk of harm**."

*Bryson*, 627 F.3d at 789 (emphasis added) (quoting *Barney v. Pulsipher*, 143 F.3d

1299, 1307 (10th Cir. 1998)).  To put it differently, deliberate indifference is shown when

---

[10] The excerpts Plaintiff provided of his expert's report did not define this acronym.

"the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Carr v. Castel*, 337 F.3d 1221, 1229 (10th Cir. 2003).  Notice can be established by proving the existence of a pattern of tortious conduct.  *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997).  In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.  *Id.*; *accord Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998); *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317 (10th Cir. 2002). Additionally, the inadequate municipal policy must be the "moving force" behind the violation.  *Olsen*, 312 F.3d at 1318.

The Court finds that Plaintiff has not presented facts sufficient to meet this demanding "deliberate indifference" standard.  No reasonable juror could conclude that Lake County had notice that its training program made it "substantially certain" or "plainly obvious" that its deputies would engage in an unlawful use of force; indeed, Plaintiff's expert's report argued that Deputy Hinton's actions **in this specific incident** constituted the evidence that the training program was insufficient.  This evidence, however, represents an impermissible attempt to fasten liability onto a city because "a particular officer may be unsatisfactorily trained."  *City of Canton, Ohio v. Harris*, 489

U.S. 378, 391 (1989) (noting that a showing of deliberate indifference is necessary in Section 1983 failure-to-train cases, because "It may be, for example, that an otherwise sound program has occasionally been negligently administered. . . . . Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.  And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.")

Additionally, Plaintiff points to no evidence that there was a "pattern" of tortious use of tasers by other Lake County officials, widespread or flagrant instances of taser use, or that Sheriff Fenske or Lake County had actual knowledge of a need for different training.  *Compare Allen v. Muskogee, Okl.*, 119 F.3d 837, 842 (10th Cir. 1997) (holding that a policy providing that officers should leave cover and approach a suicidal armed person to try to take away a gun exhibited "reckless indifference," because "[s]uch action is likely to provoke a violent response, resulting in a high risk of death to officers, the armed person, and other civilians.")

As for negligent hiring, Plaintiff's Complaint alleges that "Defendants Lake County and Sheriff Rodney Fenske failed to institute adequate pre-employment hiring procedures."  (Doc. # 1-4 at ¶ 68.)  Negligent hiring cases require, however, that a Plaintiff prove that an employer knew about (or should have known about) the "dangerous propensities" of an employee at the time of hiring, "gauged in relation to the duties of the job for which the employer hires the employee."  *Raleigh v. Performance*

*Plumbing & Heating*, 130 P.3d 1011, 1016 (Colo. 2006).  Plaintiff's response does not provide any evidence to support his claim that Sheriff Fenske hired Deputies Hinton or Bird and knew or should have known of any dangerous propensities, and Defendants note that both of their backgrounds are, in fact, "devoid of anything to suggest dangerous propensities."  (Doc. # 46 at 25.)

In sum, Plaintiff has failed to proffer adequate evidence that Lake County was "deliberately indifferent," or that Sheriff Fenske hired Deputies with "dangerous propensities."  As such, his claim for municipal liability fails as a matter of law.

## IV.  CONCLUSION

For the reasons provided above, the Court DENIES Defendants' Motion with respect to Plaintiff's claims of (1) excessive force, (2) battery and assault, and (3) extreme and outrageous conduct, against Defendants Hinton and Bird.  The Court GRANTS Defendants' Motion with respect to Plaintiff's claims against Sheriff Fenske.  Sheriff Fenske is accordingly dismissed as a Defendant.

DATED:   March 5, 2015

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge